**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MiCamp Solutions LLC, | No. CV-19-05468-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| National Processing LLC, | |
| Defendant. | |

Pending before the Court is MiCamp Solutions LLC's motion to dismiss National Processing LLC's third, fourth, and fifth causes of action in the amended counterclaim (Doc. 25). The motion is fully briefed. (Doc. 25); (Doc. 36); (Doc. 39). For reasons that follow, MiCamp's motion to dismiss is denied.[1]

**I.  BACKGROUND**

In July 2015 Counterclaimant National Processing entered into a marketing agreement (the "FDMS Agreement) with First Data Merchant Services Corporation ("FDMS") and Wells Fargo Bank, N.A. Pursuant to the FDMS Agreement, National Processing solicited business owners to participate in a bank card processing program (the "Program") that had been jointly developed by Wells Fargo and FDMS. (Doc. 21, ¶ 12.) National Processing received a monthly commission from FDMS for every business it successfully recruited into the Program. (*Id.*)

---

[1] MiCamp requested oral argument (Doc. 25 at 1). After reviewing the pleadings, however, the Court has determined that oral argument would not have aided the Court's decisional process. *See* LRCiv 7.2(f).

In July 2018 National Processing and MiCamp entered into a receivables sales agreement (the "Agreement"), which is the subject of this litigation.  Pursuant to the Agreement, MiCamp paid National Processing $1,249,600 in exchange for a portfolio of assets, including National Processing's database of potential customers and the right to earn National Processing's monthly commissions under the FDMS Agreement.  (Doc. 25 at 3); (Doc. 21, ¶ 13.)  The Agreement further provided that MiCamp would pay National Processing $454,500 (the "tail payment") if MiCamp earned at least $613,440 in commission from FDMS during the first year that the Agreement was in effect.  (Doc. 25 at 3); (Doc. 21, ¶ 15.)  The Agreement also contained a "no contact" provision, which prevented National Processing from contacting or communicating with businesses in the purchased portfolio.  (Doc. 1-3 at 6.)

One year after MiCamp and National Processing entered the Agreement, MiCamp initiated this action in Maricopa County Superior Court.  (Doc. 1 at 2.)  MiCamp filed an amended complaint, and National Processing removed the action to this Court.  The amended complaint alleges that National Processing breached the Agreement's no-contact provision, as well as the covenant of good faith and fair dealing, by contacting and soliciting customers in the portfolio that MiCamp had purchased. (Doc. 1-3 at 7.)  National Processing filed a counterclaim (Doc. 8) and amended counterclaim (Doc. 21).

The amended counterclaim alleges five causes of action.  National Processing alleges:  (1) that MiCamp breached the Agreement by failing to remit the tail payment; (2) that MiCamp breached the covenant of good faith and fair dealing by intentionally earning slightly less than the annual amount that would trigger the tail payment; (3) that MiCamp tortuously interfered with National Processing's prospective business relations by making misrepresentations to potential customers and customers about MiCamp's relationship with National Processing; (4) that MiCamp violated the Lanham Act, 15 U.S.C. § 1125(a), by using National Processing's name and logo on account statements; and (5) that MiCamp engaged in unfair competition by using National Processing's name and logo, and by making misrepresentations to prospective customers. (Doc. 21, ¶¶ 63-103.)  MiCamp

moves to dismiss counts three, four, and five of the amended counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 25.)

## II.     LEGAL STANDARDS

Rule 12(b)(6) authorizes the Court to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint, which is a question of law. *North Star Int'l. v. Arizona Corp. Comm'n*, 720 F.2d 578, 580 (9th Cir. 1983).  To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations; rather, it must plead "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Facial plausibility exists if the pleader pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*.  Plausibility does not equal probability, but it requires more than a sheer possibility that a defendant has acted unlawfully. *Id*.  When analyzing a counterclaim for failure to state a claim, all well-pleaded factual allegations are taken as true and construed in a light most favorable to the nonmoving party. *See North Star Int'l.*, 720 F.2d at 581.

## III.    ANALYSIS

### A.     Arizona's Economic Loss Rule

MiCamp argues that National Processing's third, fourth, and fifth causes of action are barred by Arizona's economic loss doctrine, which is a "common law rule limiting a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property." (Doc. 25 at 5); *Flagstaff Affordable Housing Ltd. P'ship v. Design All., Inc.*, 223 P.3d 664, 667 (Ariz. 2010).  In response, National Processing argues that no Arizona court has applied the economic loss rule to claims for tortious interference, Lanham Act violations, or unfair competition. (Doc. 36 at 6.)  It also argues that rule is inapplicable because the claims in counts three, four, and five do not stem from any contractual obligation in the Agreement. (Doc. 36 at 6-8.)  The Court agrees with National Processing.

The purpose of the economic loss rule is to "encourage private ordering of economic relationships and to uphold the expectations of the parties by limiting a plaintiff to contractual remedies for the loss of the benefits of the bargain." *Flagstaff Affordable Housing Ltd. P'ship*, 223 P.3d at 671. The doctrine first arose in product liability cases, centered on the belief that tort law principles should not interfere with the rights of sellers and consumers to privately allocate risks of product failure, unless the product failure threatens public safety. *See* Edward P. Ballinger, Jr. & Samuel A. Thumma, *The Continuing Evolution of Arizona's Economic Loss Rule*, 39 Ariz. St. L.J. 535 (2007). Accordingly, Arizona courts have typically applied the economic loss rule only in the contexts of product liability or construction defect cases. *Flagstaff Affordable Housing Ltd. P'ship*, 223 P.3d at 667. Application outside of these two contexts has involved a detailed contract for services that allocated risk of loss and specified remedies. *See Kenneth Eisen & Assocs., Ltd. v. CoxCom, Inc.*, No. CV-18-02120-PHX-JJT, 2019 WL 669770, at *2 (D. Ariz. Feb. 19, 2019) (*citing Cook v. Orkin Exterminating Co., Inc.*, 258 P.3d 149, 151-153 (Ariz. Ct. App. 2011) (applying the rule to tort claims arising out of a pest control contract).

Because the Arizona Supreme Court has not expressly declared that the economic loss rule may only apply in product liability and construction defect cases, the scope of the economic loss rule remains unclear. *See Firetrace USA, LLC v. Jesclard*, 800 F. Supp. 2d 1042, 1051-52 (D. Ariz. 2010) (recognizing that *Flagstaff Affordable Housing* fell short of declaring that the rule only applies in those two contexts); *see also Kenneth Eisen & Assocs., Ltd.*, 2019 WL 669770, at *2 (acknowledging that the scope of the rule is "not crystal clear"). But MiCamp cites no case to establish that Arizona courts would apply the economic loss rule to National Processing's tort claims in this context, particularly where the Agreement does not govern product or property. *See also Firetrace USA, LLC*, 800 F. Supp. 2d at 1052 (declining to apply Arizona's economic loss rule to tortious interference and unfair competition claims where the parties' relationship was governed by an employment contract). Because federal courts are not free to expand the existing scope

of state law without clear guidance from the state's highest court, *see*, *e.g.*, *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1024 (9th Cir. 2008), the Court declines to apply Arizona's economic loss rule to National Processing's claims. MiCamp's motion to dismiss counts three, four, and five of National Processing's amended counterclaim under the economic loss rule is denied.

### B. Count Three

The third cause of action in National Processing's amended counterclaim is tortious interference with prospective business relations. (Doc. 21, ¶¶ 76-85.) In Arizona, a claim for tortious interference must allege (i) the existence of a valid contractual relationship or business expectancy; (ii) that the interferer had knowledge of the relationship or business expectancy; (iii) that there was intentional interference inducing or causing a breach of the contract or termination of the relationship; and (iv) that there was resultant damage to the party whose relationship or expectancy has been disrupted. *Dube v. Likins*, 167 P.3d 93, 97, 99 (Ariz. Ct. App. 2007). To state a claim for tortious interference, the alleged facts must show that the "expectancy constitutes more than mere hope." *Id*. at 99 (internal citation omitted).

MiCamp asks the Court to dismiss count three of the amended counterclaim because it claims that National Processing failed to allege a valid contract or business expectancy. (Doc. 25 at 6.) The Court disagrees. The amended counterclaim alleges that National Processing continued to offer credit card processing services to businesses outside of those contained in the portfolio that was purchased by MiCamp. It further alleges that MiCamp made false representations about National Processing to those prospective customers. (Doc. 21, ¶¶ 35-39.) The alleged misrepresentations included statements by MiCamp to its prospective customers that MiCamp was the parent company of National Processing, and that as such, it could provide lower rates than National Processing that did not include a "markup." (*Id*. ¶ 38.) The amended counterclaim further states that MiCamp's false and misleading statements threatened to discredit National Processing's business reputation and interfered with its prospective contractual relations. (*Id*. ¶ 43.) While the amended

counterclaim does not specifically identify the other businesses with whom National Processing allegedly had a valid business expectancy, the Court agrees with National Processing that interference with the opportunity to obtain customers is sufficient, and interference with a single specific relationship is not required. *See Edwards v. Anaconda Co.*, 565 P.2d 190, 192-93 (Ariz. Ct. App. 1977).

Next, MiCamp argues that National Processing failed to allege in count three that MiCamp knew of National Processing's legitimate business expectancy. (Doc. 25 at 7.) Again, the Court disagrees. The amended counterclaim states that MiCamp misrepresented to prospective customers that it could undercut National Processing's rates because it was the parent company. The fact that MiCamp mentioned undercutting National Processing's rates, if true, suggests that MiCamp had knowledge of National Processing's legitimate business expectancy in those business relationships. In any event, MiCamp's alleged knowledge of National Processing's general expectancy to "continually attempt[] to negotiate with other companies" is sufficient knowledge in this context. *Edwards*, 565 P.2d at 192.

Finally, MiCamp argues that the amended counterclaim fails to allege any facts to support the allegation that MiCamp's alleged interference caused the breach of a valid contract or the loss of a legitimate business expectancy. (Doc. 25 at 7.) To the contrary, the amended counterclaim alleges that MiCamp's affirmative misrepresentations damaged National Processing's goodwill and business reputation, and interfered with prospective business relationships. (Doc. 21, ¶ 43.) National Processing has stated a claim for tortious interference. MiCamp's motion to dismiss count three is denied.

### C. Counts Four and Five

Count four of the amended counterclaim alleges a violation of the Lanham Act, 15 U.S.C. § 1125(a), stemming from MiCamp's alleged misuse of National Processing's name, logo and address on statements and communications that MiCamp sent to businesses. (Doc. 21, ¶¶ 87, 89.) Count five alleges common law unfair competition

related to the same.[2]  (Doc. 21, ¶¶ 97-103.)

MiCamp argues that counts four and five should be dismissed because it was FDMS that was responsible for transmitting billing statements to businesses, and the FDMS Agreement expressly rejects any principal-agent relationship between MiCamp and FDMS.  (Doc. 25 at 8.)  National Processing responds that counts four and five do not rest solely on a theory of principal-agent relationship, but that even if they did, the FDMS Agreement is not dispositive of whether a principal-agency relationship existed between MiCamp and National Processing.  (Doc. 36 at 15-16.)  The Court agrees with National Processing.

First, MiCamp incorrectly construes counts four and five as resting solely on a theory of agency, which is the principle that "one acting by another is acting for himself." *Barlage v. Valentine*, 110 P.3d 371, 376 (App. 2005) (citations omitted).  Instead, the amended counterclaim alleges both that MiCamp personally transmitted account statements containing National Processing's logo *and* that FDMS did so on MiCamp's behalf.  (*Id.* ¶¶ 44, 46-48, 88.)  The amended counterclaim further states that MiCamp utilized National Processing's logo on its "communications" with merchants, apart from its use of the logo on account statements.  (Doc. 21, ¶¶ 88, 100.)  Accordingly, counts four and five do not rely strictly on an agency-principal relationship between MiCamp and FDMS.

In any event, the Court also agrees with National Processing that the language of the FDMS Agreement and Agreement,[3] which disclaimed any relation of principal and

---

[2] The common law doctrine of unfair competition in Arizona encompasses several tort theories, such as trademark infringement, false advertising, misappropriation, and "palming off," which is the making of a false representation tending to induce buyers to believe that the defendant's product is that of the plaintiff. *Fairway Constructors, Inc. v. Ahern*, 970 P.2d 954, 956 (Ariz. Ct. App. 1998).

[3] While review of a motion brought pursuant to Rule 12(b)(6) is generally limited to the complaint, *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993), courts may "consider certain [other] materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment," *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  The Court has considered the text of the FDMS Agreement and the Agreement because they were incorporated by reference in the amended counterclaim. (*See* Doc. 21, ¶¶ 12, 13.)

agent between MiCamp and FDMS, (Doc. 27, ¶ 20); (Doc. 25-1, at 4), is not dispositive of the principal-agent inquiry. *See Arizona Med. Ctr. v. Arizona Health Care Cost Containment Sys. Admin.*, 935 P.2d 854, 860 (Ariz. Ct. App. 1996) (finding based on the totality of the circumstances that an agency relationship existed even though language in the contract stated otherwise). The question in a Rule 12(b)(6) motion is whether the counterclaimant's well-pleaded allegations, *taken as true*, are sufficient to establish the essential elements of its claim. Here, National Processing maintains that, while FDMS was responsible for processing the account statements, (*see* Doc. 27, ¶¶ 1, 3, 7(b)), MiCamp had the authority and opportunity to ask that National Processing's logo be removed. (Doc. 21, ¶ 47.) This is sufficient to survive the Rule 12(b)(6) motion.

Finally, MiCamp argues that National Processing did not suffer any damages from the use of its logo on merchant statements because National Processing was barred by the Agreement from doing business with those merchants. (Doc. 25 at 9.) This argument ignores, however, the alleged harm to National Processing's general reputation in the credit card processing industry. (Doc. 21, ¶¶ 54-59, 94.) National Processing further alleged a likelihood that merchants in the Program would inform other businesses that National Processing's services were deficient or substandard, even though those merchants received services from MiCamp and FDMS, not National Processing. (*Id.* ¶ 56.) Because "damage[s] to . . . business reputation . . .are injuries to precisely the sorts of commercial interests the [Lanham] Act protects," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137 (2014), National Processing has sufficiently stated claims under the Lanham Act and for unfair competition. The motion to dismiss counts four and five of the amended counterclaim is denied.

IV. **CONCLUSION**

**IT IS ORDERED denying** MiCamp's request for oral argument (part of Doc. 25).

**IT IS ORDERED denying** MiCamp's Motion to Dismiss the Third-Fifth Cases of Action of National Processing, LLC's Amended Counterclaim (Doc. 25).


Dated this 10th day of July, 2020.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge